UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA )<br><br>v. )<br><br>(1)  OSCAR MANUEL CASTANOS )<br>      GARCIA, )<br>(2)  JOEL JOSE CRUZ RODRIGUEZ, )<br>      a/k/a "Paflow," )<br>(3)  EDWARD JOSE PUELLO )<br>      GARCIA, )<br>(4)  JOAN MANUEL MATHILDA )<br>      LEON, )<br>(5)  LUIS GERMAN SANTOS )<br>      BURGOS, )<br>      a/k/a "Mambo Flow," )<br>(6)  GERARDO HERIBERTO NUÑEZ )<br>      NUÑEZ, )<br>(7)  RANSEL STARLIN TAVAREZ )<br>      JIMENEZ, and )<br>(8)  JOEL FRANCISCO MATHILDA )<br>      LEON, )<br><br>                      Defendants )  | Criminal No. 1:24-cr-  10138<br><br>Violations:<br><br>Count One: Conspiracy to Commit Mail Fraud<br>and Wire Fraud<br>(18 U.S.C. § 1349)<br><br>Count Two: Money Laundering Conspiracy<br>(18 U.S.C. § 1956(h))<br><br>Mail and Wire Fraud Forfeiture Allegation:<br>(18 U.S.C. § 981(a)(1)(C) and<br>28 U.S.C. § 2461(c))<br><br>Money Laundering Forfeiture Allegation:<br>(18 U.S.C. § 982(a)(1)) |

## INDICTMENT

At all times relevant to this Indictment:

### Overview

1.     For at least two years, defendant OSCAR MANUEL CASTANOS GARCIA ("CASTANOS") and his co-defendants ran a sweeping scam targeting elderly victims throughout the United States.  Using a sophisticated call center operation in the Dominican Republic, the defendants tricked victims into believing that their grandchildren and other close family members were in trouble and needed money.  Once the defendants had separated the victims from that money, they laundered their illicit proceeds back to the Dominican Republic through a complex network of unwitting rideshare drivers, runners, cash handoffs, and bank transfers disguised as

business transactions.  Through their call center operation, the defendants defrauded hundreds of elderly victims out of millions of dollars.

<u>General Allegations</u>

2.      CASTANOS lived in the Dominican Republic.

3.      Between at least as early as May 2022 and in or about April 2024, CASTANOS oversaw a call center operation in Santiago de los Caballeros ("Santiago"), Puerto Plata, and elsewhere in the Dominican Republic ("the Call Center") that perpetrated "grandparent" scams, described above and more fully below, that targeted elderly victims throughout the United States.

4.      Defendants EDWARD JOSE PUELLO GARCIA ("PUELLO") and JOEL JOSE CRUZ RODRIGUEZ ("RODRIGUEZ") lived in the Dominican Republic.

5.      PUELLO and RODRIGUEZ assisted CASTANOS with operating the Call Center and managing its employees.

6.      Defendant JOAN MANUEL MATHILDA LEON ("JOAN MATHILDA") lived in the Dominican Republic and in the Bronx, New York.

7.      JOAN MATHILDA recruited and oversaw "runners" who retrieved proceeds of grandparent scams in the United States for the Call Center.

8.      Defendant LUIS GERMAN SANTOS BURGOS ("BURGOS") lived in the Dominican Republic and in Dorchester, Massachusetts.

9.      BURGOS at times partnered with CASTANOS in carrying out grandparent scams and assisting the Call Center with retrieving the scam proceeds from the United States.

10.      Defendants RANSEL STARLIN TAVAREZ JIMENEZ ("JIMINEZ") and JOEL FRANCISCO MATHILDA LEON ("JOEL MATHILDA") lived in the Bronx, New York.

2

11.     Defendant GERARDO HERIBERTO NUÑEZ NUÑEZ ("NUÑEZ") lived in the Dominican Republic.

12.     Co-conspirator 1 ("CC-1") lived in the Bronx, New York.

13.     Co-conspirator 2 ("CC-2") lived in Winter Park, Florida.

14.     Co-conspirator 3 ("CC-3") lived in Defiance, Missouri.

15.     Co-conspirator 4 ("CC-4") lived in Santa Clarita, California.

16.     Co-conspirator 5 ("CC-5") lived in New Jersey.

17.     JIMINEZ, JOEL MATHILDA, CC-1, CC-2, CC-3, CC-4, and CC-5 were runners for the Call Center in the United States.

18.     Co-conspirator 6 ("CC-6") lived in Queens, New York.

19.     NUÑEZ and CC-6 assisted the Call Center by transferring grandparent scam proceeds from the United States to the Dominican Republic.

<u>Grandparent Scams</u>

20.     A grandparent scam was a type of fraud in which a perpetrator contacted an elderly victim over the phone and impersonated the victim's grandchild, other relative, or close friend. The caller convinced the victim that the grandchild or other loved one was in some sort of serious legal or medical trouble and needed money immediately (*e.g.*, that the loved one had been in a motor vehicle accident or had been arrested).

21.     In many instances, grandparent scams involved several callers—one caller who impersonated the victim's loved one and a second caller who impersonated a lawyer or other authority figure.

22.     The perpetrators of the scam typically tricked the victim into giving up thousands of dollars in cash, purportedly to assist the victim's loved one.  In some cases, the perpetrators of the scam instructed the victim to send the money to a specified address.  In others, the perpetrators sent a driver to the victim's location, either to pick up the money or to drive the victim to the bank to withdraw cash.

<u>Object and Purposes of the Mail and Wire Fraud Conspiracy</u>

23.     The principal objects of the conspiracy were to commit mail fraud and wire fraud by, among other things, scamming elderly victims throughout the United States.

24.     The principal purposes of the conspiracy were to enrich the defendants and to conceal the defendants' conduct from the victims, from unwitting rideshare drivers, and from law enforcement authorities.

<u>Manner and Means of the Mail and Wire Fraud Conspiracy</u>

25.     Among the manner and means by which the defendants and co-conspirators known and unknown to the Grand Jury carried out the mail and wire fraud conspiracy were the following:

a.     establishing and staffing Call Center locations in Santiago, Puerto Plata, and elsewhere for the purpose of perpetrating grandparent scams;

b.     leasing voice-over-internet-protocol ("VOIP") accounts that allowed Call Center employees to place calls from the Dominican Republic that appeared to victims to come from inside the United States;

c.     obtaining lists of elderly victims (whom defendants referred to as "clients") and directing Call Center employees to make fraudulent calls to the victims on those lists;

       d.      hiring, supervising, and paying English-speaking Call Center employees who contacted elderly victims;

       e.      providing Call Center employees known as "Openers" with narratives to use when impersonating an elderly victim's grandchild and convincing the victim that the grandchild was in trouble;

       f.      paying Openers a portion (typically around 10 percent) of money they helped to steal from victims (which defendants referred to as "sales");

       g.      once Openers deceived elderly victims into believing their grandchild required assistance, directing Call Center employees known as "Closers" to contact the victims, impersonate the grandchild's attorney, and instruct the victims to provide thousands of dollars in cash, in some cases by mail or private interstate carrier, and in other cases to couriers who would visit their homes;

       h.      paying Closers a portion (typically around 20 percent) of their "sales";

       i.      recruiting and dispatching U.S.-based "runners"—including JOAN MATHILDA, JIMINEZ, JOEL MATHILDA, CC-1, CC-2, CC-3, CC-4, and CC-5—to collect cash obtained from victims;

       j.      sending runners instructions for pickups via encrypted messaging services;

       k.      protecting runners from detection and arrest by using unwitting rideshare drivers to visit the victims' homes to pick up cash; transport victims to the bank to withdraw funds; and deliver the money to the runners at public locations;

l.      subjecting rideshare drivers to suspicion and arrest instead of the defendants and their co-conspirators;

m.      paying runners a portion of the scam proceeds (typically around 15 percent) from each pickup; and

n.      contacting victims tricked into making a first payment to get a second payment (a "reload") and, in some cases, a third payment (a "triload").

<u>Acts in Furtherance of the Mail and Wire Fraud Conspiracy</u>

26.     On various dates between at least as early as in or about May 2022 and in or about April 2024, CASTANOS, RODRIGUEZ, PUELLO, JOAN MATHILDA, BURGOS, JIMINEZ, JOEL MATHILDA, CC-1, CC-2, CC-3, CC-4, CC-5, and others known and unknown to the Grand Jury committed and caused to be committed the following acts, among others, in furtherance of the mail and wire fraud conspiracy.

*Victim 1*

27.     On or about September 29, 2022, an Opener called Victim 1, an elderly man living in Conroe, Texas.  The Opener impersonated Victim 1's grandson and told Victim 1 that he had been in a car crash and broken his jaw.

28.     Thereafter, a Closer spoke with Victim 1, introduced himself as attorney "Mark Stevens," and told Victim 1 that his grandson had been criminally charged in connection with injuring a pregnant woman.  The Closer instructed Victim 1 to ship $7,200 overnight via UPS to an address in Attleboro, Massachusetts.

29.    CASTANOS and JOAN MATHILDA instructed JIMINEZ to travel from New York to Massachusetts the following day to collect the package that Victim 1 sent.

30.    On or about September 30, 2022, after the package containing Victim 1's money was delivered, JIMINEZ picked up the package from the Attleboro address and returned to New York.

31.    On or about October 3, 2022, a Closer contacted Victim 1 again, pretended to be attorney Mark Stevens, and told Victim 1 that his grandson needed $5,000 more in cash because the pregnant woman injured in the accident had lost her baby.  The Closer directed Victim 1 to send the extra money to a second Attleboro address.

32.    On or about October 3, 2022, other Call Center employees deceived another elderly man living in Conroe, Texas into sending $12,500 to the second Attleboro address, purportedly to help his grandson.

33.    CASTANOS directed JIMINEZ to collect both packages from the second Attleboro address the following day.

34.    On or about October 4, 2022, JIMINEZ drove to the second Attleboro address and attempted to pick up one of the packages from the front porch after it was delivered.

35.    After JIMINEZ failed to collect the packages sent to the second Attleboro address, CASTANOS asked BURGOS for assistance with collecting the packages.

36.    BURGOS then sent two of his relatives in Massachusetts to the second Attleboro address to pick up the packages.

*Victim 2*

37.     On or about February 7, 2023, CASTANOS and JIMINEZ sent JOEL MATHILDA and CC-5 to Syracuse, New York to collect money from grandparent scam victims.

38.     On or about February 8, 2023, CASTANOS and RODRIGUEZ directed Call Center employees to target potential victims in New York and Florida, where other runners were stationed.

39.     On or about February 8, 2023, an Opener called Victim 2, an elderly woman living in Auburn, New York.  The Opener impersonated Victim 2's grandson and stated that he had been in a car accident, that he had been arrested, and that he needed $9,500 for bail.

40.     After Victim 2 withdrew cash from her bank, a Closer spoke with Victim 2 and introduced himself as "Attorney Mark Stevens."  The Closer instructed Victim 2 to place the cash in a shoebox, to give it to a driver who would come to Victim 2's house, and to tell the driver that the box contained documents.

41.     RODRIGUEZ directed JOEL MATHILDA and CC-5 to send a driver to Victim 2's address.

42.     JOEL MATHILDA used an account with Uber to send a driver to Victim 2's address.  JOEL MATHILDA falsely messaged the driver, "Good morning, I'm working and my parents are going to send me some documents in a package[.]"

43.     JOEL MATHILDA then directed the Uber driver to deliver the package from Victim 2 to a shopping center in Syracuse, where JOEL MATHILDA and CC-5 met and took the package containing Victim 2's money from the driver.

8

44.    Shortly thereafter, the Closer called Victim 2 again and told her that her grandson needed $7,000 more because a baby had been killed in the car accident.

45.    At RODRIGUEZ's direction, CC-5 ordered another Uber driver to pick up a package from Victim 2's address and to deliver it to the shopping center.

46.    The Closer then called Victim 2 a third time and told her that, due to a mix-up, her grandson needed $8,000 more for bail.  The Closer advised Victim 2 to withdraw the funds from a different branch of her bank.

47.    At RODRIGUEZ's direction, JOEL MATHILDA ordered another Uber driver to pick up this package from Victim 2 and to deliver it to the shopping center.

48.    Later on or about February 8, 2023, RODRIGUEZ reported to CASTANOS that the group had obtained $9,500, $7,000 (a "reload"), and $8,000 (a "triload") in New York.

49.    On or about February 9, 2023, a Closer called Victim 2 again and requested more money.

50.    RODRIGUEZ directed JOEL MATHILDA and CC-5 to order another pickup from Victim 2's address and told them to be careful when collecting money for the fourth time from this "client."

51.    JOEL MATHILDA ordered another Uber driver to pick up a package at Victim 2's address and to drop off the package at the shopping center in Syracuse.

*Victim 3 and Victim 4*

52.    On or about February 21, 2023, CASTANOS sent CC-1 and CC-3 to Massachusetts to collect cash from grandparent scams.

53.     An Opener contacted Victim 3, an elderly woman living in Agawam, Massachusetts.  The Opener, impersonating Victim 3's grandson, stated that he had been in a car accident in Pennsylvania, that he needed $13,800 in cash for bail, and that someone would pick up the cash at her home.

54.     RODRIGUEZ sent Victim 3's address to CC-1 and CC-3 and directed them to send a rideshare driver.

55.     CC-3 used an account with Lyft to send a driver to pick up the money from Victim 3's address and to deliver it to CC-3 in Dudley, Massachusetts.

56.     Following this initial pickup, a Closer contacted Victim 3 and told her that her grandson needed $10,000 more in cash because the other person involved in the accident had been pregnant, her baby had died, and her grandson was being charged with manslaughter.

57.     At RODRIGUEZ's direction, CC-1 ordered another Lyft driver to pick up the extra money from Victim 3 and to drop it off in Dudley.

58.     Later on or about February 21, 2023, a Closer impersonating attorney "Mark Stevens" called Victim 3 and asked for more money.

59.     CC-1 used a Lyft account to order another pickup at Victim 3's address and delivery in Dudley.  CC-1 falsely messaged the driver, "Hello, my grandmother will send some documents, can you bring them to me, please? I'm going to tip you, university documents[.]"

60.     RODRIGUEZ reported to CASTANOS that the day's "sales" included "$13,800 MA," "6,000 MA Reload," and "$4,000 MA Triload."

61.    On or about February 22, 2023, an Opener called Victim 4, an elderly man living in Easthampton, Massachusetts.  The Opener, impersonating Victim 4's grandson, stated that he had been involved in an accident, that he had suffered significant injuries, and that he needed money for bail.

62.    A Closer pretending to be attorney "Mark Stevens" called Victim 4 and directed him to give $9,000 in cash to a driver who would come to Victim 4's home.

63.    RODRIGUEZ sent Victim 4's address to CC-1 and CC-3.

64.    CC-3 ordered a Lyft driver to pick up the money from Victim 4's address and to deliver it to CC-3 in Dudley.

65.    Later on or about February 22, 2023, JOAN MATHILDA sent CASTANOS a calculation of total "sales" from Florida and Massachusetts of $57,175, including the $9,000 from Victim 4, and subtracting payments of 15 percent to the runners.

*Victim 5*

66.    On or about March 1, 2023, RODRIGUEZ directed Call Center employees to target potential victims in California.

67.    An Opener contacted Victim 5, an elderly man living in San Diego, California, and told Victim 5 that his grandson had been in a car accident and needed $10,000 for bail.

68.    A Closer pretending to be an attorney instructed Victim 5 to withdraw money and to give it to a courier.

69.    RODRIGUEZ sent Victim 5's address to CC-4 and directed CC-4 to send a rideshare driver.

70.     CC-4 used an account with Lyft to send a driver to Victim 5's home, pick up $9,000 in cash from Victim 5, and deliver the money to CC-4's location.

71.     Later on or about March 1, 2023, the Closer contacted Victim 5 again and told Victim 5 that he could settle the grandson's case for an additional $10,000.

72.     CASTANOS directed CC-4 to send another driver to Victim 5's address for a "reload."

73.     CC-4 used a different Lyft account to order another driver to pick up the money from Victim 5's address.  At CASTANOS's direction, CC-4 texted a link for tracking the Lyft driver to the Closer so that the Closer could update Victim 5 on the driver's expected arrival.

74.     CC-4 received Victim 5's money from the driver at the delivery location.

75.     RODRIGUEZ reported the initial $9,000 and the $10,000 "reload" to CASTANOS.

76.     On or about March 1, 2023, JOAN MATHILDA sent CASTANOS a calculation of "sales" from Massachusetts, Maryland, Indiana, and California (including the $19,000 from Victim 5), subtracting payments of 15 percent to the runners.

*Victim 6*

77.     On or about March 29, 2023, a Closer called Victim 6, an elderly man living in Fort Worth, Texas.  The Closer impersonated an attorney and told Victim 6 that his daughter had been arrested in Oklahoma for driving while intoxicated.  The Closer told Victim 6 that he would send a car to take Victim 6 to the bank to withdraw money for his daughter.

78.     At CASTANOS's direction, CC-2 arranged for a Lyft driver to drive Victim 6 to the bank.  CC-2 falsely messaged the driver: "Just going to be taking me to the bank and then back

12

home[.]  If you can just be patient with me and wait until I am done at the bank I will give you a tip for your time[.]"

79.    Once Victim 6 returned home, the Closer called Victim 6 again and told him to place the money in a box and to provide it to someone who would come to his house.

80.    CC-2 ordered another Lyft driver to pick up a package containing cash from Victim 6's home.  CC-2 falsely messaged the driver: "Hey sir their [sic] going to be sending me a package with some legal documents inside[.]"  After Victim 6 did not immediately meet the driver, CC-2 messaged the driver: "Sorry for the long wait sir […] Forgive him he's old[.]"  CC-2 directed the driver to deliver the cash to CC-2 at a dry cleaner in Dallas, Texas.

81.    On or about March 29, 2023, RODRIGUEZ reported "sales" in Texas to CASTANOS, including the $8,000 and the $10,000 "reload" from Victim 6.

82.    On or about March 30, 2023, after seeing a deposit slip showing Victim 6's account balance, CASTANOS told the Closer to ask Victim 6 for another $35,000.

83.    The Closer called Victim 6 again and instructed him to withdraw more cash for his daughter.

84.    CASTANOS directed CC-2 to send Victim 6 to a different bank branch to avoid questions that bank employees might ask Victim 6.

85.    CC-2 then ordered another Lyft driver to take Victim 6 to the bank and home.

86.    On or about March 30, 2023, JOAN MATHILDA reported to CASTANOS on the amounts of cash held by runners in Texas, Florida, Louisiana, California, and Virginia, including $50,895 CC-2 held in Texas.

13

87.     On or about April 1, 2023, PUELLO calculated Openers' and Closers' cuts from recently obtained scam proceeds, including the $18,000 from Victim 6.

*Operating the Call Center, Protecting the Proceeds from Theft, and Evading Detection*

88.     On or about July 25, 2022, CASTANOS instructed Closers to tell victims to send money by UPS or the United States Postal Service because FedEx was warning customers not to send cash.

89.     On or about September 14, 2022, RODRIGUEZ sent an Opener a script for impersonating a victim's grandchild, telling the victim about being in jail following a car accident, asking for the victim's help with bail, and requesting, "Please, promise that you will keep this between us until I get out, I am ashamed about this[.]"

90.     On or about October 17, 2023, CASTANOS brought in a Closer from another call center to teach Closers how to convince victims to go to the bank to withdraw money.

91.     On or about October 26, 2022, after JIMINEZ sent CASTANOS information about a Lyft driver sent to pick up money from a victim, CASTANOS told JIMINEZ to look for older drivers who were less likely to be curious about packages.

92.     After JIMINEZ expressed concern about having used his own Lyft account to order a pickup, CASTANOS suggested that JIMINEZ could claim that his Lyft account had been hacked.

93.     On or about January 13, 2023, JIMINEZ notified other runners, including JOEL MATHILDA, CC-1, CC-3, and CC-5 that, going forward, CASTANOS would require them to

record videos of themselves opening packages or else be responsible for paying any amounts missing from packages.

94.     On or about February 22, 2023, after CC-3 reported a police officer near his location, CASTANOS told CC-3 to change the drop-off location of a package delivery that was underway and to monitor whether the officer moved to the new drop-off location.

95.     On or about March 13, 2023, JIMINEZ and CC-4 discussed how to connect a victim in a gated community with the Lyft driver CC-4 had ordered to pick up a package from her, after the Lyft driver messaged CC-4, "They won't let me in unless they speak to your grandmother and the grandmother is not answering her phone."

96.     On or about March 21, 2023, after an Uber driver picked up money and cancelled the drop-off, CASTANOS directed co-conspirators to call the Uber driver, pretend to be police officers, and message the driver, "If you['re] trying to steal the money I will have the authorit[ies] come straight to your front door[.]"

<u>Manner and Means of the Money Laundering Conspiracy</u>

97.     Among the manner and means by which the defendants and co-conspirators known and unknown to the Grand Jury carried out the conspiracy were the following:

a.     recruiting and dispatching runners in the United States to pick up grandparent scam proceeds from the Call Center's victims;

b.     instructing the runners to engage in financial transactions with the victims' money, including depositing cash into bank accounts and delivering it to co-conspirators in New York and elsewhere;

     c.      providing runners with account information for U.S.-based bank accounts in the names of purported businesses, into which the runners could deposit grandparent scam proceeds to be transmitted outside the United States;

     d.      depositing grandparent scam proceeds into bank accounts supplied by NUÑEZ, CC-6, and others;

     e.      obtaining fake driver's licenses for runners to use when depositing cash into the bank accounts provided by NUÑEZ, CC-6, and others;

     f.      directing runners to deposit less than $10,000 in any single deposit, to avoid banks' reporting the transactions as suspicious;

     g.      charging a fee of approximately 8 to 10 percent in exchange for transmitting scam proceeds from the United States to the Dominican Republic.

     h.      arranging for money deposited in New York City to be delivered to NUÑEZ in the Dominican Republic; and

     i.      conducting financial transactions with the funds deposited or delivered by the runners in order to transmit those proceeds to CASTANOS and others in the Dominican Republic, including through informal money transmissions and transfers through foreign intermediaries.

<u>Acts in Furtherance of the Money Laundering Conspiracy</u>

98.     On various dates between at least as early as in or about May 2022 and in or about April 2024, CASTANOS, RODRIGUEZ, PUELLO, JOAN MATHILDA, BURGOS, NUÑEZ, JIMINEZ, JOEL MATHILDA, CC-1, CC-2, CC-3, CC-4, CC-5, CC-6, and others known and

unknown to the Grand Jury committed and caused to be committed the following acts, among others, in furtherance of the money laundering conspiracy:

99.    On or about September 13, 2022, CASTANOS requested BURGOS's assistance with retrieving grandparent scam proceeds in Massachusetts.

100.    On or about September 13, 2022, BURGOS arranged for an associate to receive cash for CASTANOS at an address in Dorchester, Massachusetts later that day.

101.    On or about September 23, 2022, CASTANOS sent BURGOS information about several packages that the Call Center had caused elderly victims to ship via UPS to addresses in Massachusetts.

102.    On or about September 23, 2022, BURGOS arranged for one or more associates in Massachusetts to collect the packages and directed the cash inside them to CASTANOS, minus a cut for BURGOS and his associates.

103.    On or about October 16, 2022, CASTANOS asked NUÑEZ for a bank account to use for depositing cash in the United States and transferring it outside the United States.

104.    On or about October 17, 2022, NUÑEZ sent CASTANOS information for two bank accounts and told CASTANOS how much should be deposited into each.

105.    On or about October 20, 2022, after NUÑEZ provided CASTANOS with information for another bank account, JOAN MATHILDA and CC-3 deposited $88,640 in cash proceeds from grandparent scams into that account, including eight deposits of $10,000.

106.    Later on or about October 20, 2022, NUÑEZ told CASTANOS to have runners deposit less than $10,000 per transaction.

107.    On or about October 20, 2022, NUÑEZ also sent CASTANOS the contact information for NUÑEZ's nephew, CC-6, so that CASTANOS could direct runners to deliver cash to CC-6 in New York.

108.    On or about November 4, 2022, NUÑEZ sent CASTANOS information for Bank Account 1, an account in the name of a wholesaler of vaping products.

109.    On or about December 10, 2022, NUÑEZ sent CASTANOS information for Bank Account 2, an account in the name of a bodega.

110.    On or about December 12, 2022, at a branch in Florida, JIMINEZ, CC-1, and CC-2 each deposited $8,000 in cash from grandparent scams into Bank Account 2.

111.    Between on or about December 28 and December 30, 2022, CC-2 made at least 13 deposits totaling $121,090 into Bank Account 1.

112.    On or about December 29, 2022, NUÑEZ sent CASTANOS information for Bank Account 3, an account in the name of a purported smartphone repair company.

113.    On or about December 30, 2022, CC-2 deposited $10,000 into Bank Account 3 after collecting cash from grandparent scams in Florida.

114.    On or about January 5 and January 6, 2023, CC-4 made several deposits totaling $83,200 into Bank Account 1 after collecting cash from grandparent scams in California.

115.    On or about January 14, 2023, after collecting money from grandparent scams in Florida, JIMINEZ delivered $189,250 in cash to CC-6.

116.    On or about January 16, 2023, CASTANOS sent NUÑEZ a calculation of CASTANOS's share of the money JIMINEZ had delivered to CC-6, less NUÑEZ's 8 percent fee.

18

117.    On or about January 20, 2023, NUÑEZ sent CASTANOS information for Bank Account 4, an account in the name of a purported motorsports company.

118.    On or about January 20 and January 21, 2023, CC-2 and CC-5 made four deposits totaling $20,000 into Bank Account 4 after collecting cash from grandparent scams in Texas.

119.    On or about January 21, 2023, JOEL MATHILDA delivered $74,330 in grandparent scam proceeds to CC-6 in New York.

120.    On or about January 24, 2023, NUÑEZ directed CASTANOS to have $100,000 deposited into Bank Account 1.

121.    Between on or about January 24 and on or about January 26, 2023, JOEL MATHILDA and CC-3 made 12 deposits of grandparent scam proceeds totaling $106,575 into Bank Account 1.

122.    On or about January 27, 2023, CC-5 delivered $37,000 to CC-6 after collecting cash from grandparent scams in Texas.

123.    On or about February 2023, CASTANOS and RODRIGUEZ directed CC-1 and CC-3 to drive to New York, deliver the day's grandparent scam proceeds to CC-6, and return to Massachusetts to continue with pickups the following day.

124.    On or about March 4, 2023, after collecting cash from grandparent scams in Massachusetts, JIMINEZ delivered $34,470 to CC-6 in New York.

125.    On or about March 8, 2023, NUÑEZ delivered $40,000 to PUELLO.

126.    On or about March 22, 2023, CC-4 flew from Los Angeles to New York to deliver cash from grandparent scams to CC-6.

127.    On or about March 30, 2023, the day after CC-2 received $18,000 from Victim 6 in Texas, JOAN MATHILDA reported to CASTANOS that CC-2 held a total of $50,895 in Texas and $18,210 in Florida.

128.    On or about April 1, 2023, JOAN MATHILDA directed CC-2 to fly from Dallas to New York to deliver cash to CC-6.

129.    On or about April 1, 2023, CC-2 delivered $60,680 in cash to CC-6, including the $18,000 he collected from Victim 6 in Texas.

130.    On or about April 6, 2023, CC-1 delivered $11,140 to CC-6.

131.    On or about April 14 and April 15, 2023, NUÑEZ delivered $55,045 and $60,000, respectively, to PUELLO and transferred additional funds to CASTANOS electronically.

132.    On or about April 23, 2023, CC-3 delivered $55,468 to CC-6 after collecting cash from grandparent scams in Missouri.

133.    On or about May 21, 2023, CC-2 delivered $96,135 in grandparent scam proceeds to CC-6 in New York.

<u>COUNT ONE</u>
Conspiracy to Commit Mail Fraud and Wire Fraud
(18 U.S.C. § 1349)

The Grand Jury charges:

134.    The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 133

of this Indictment.

135.    From at least as early as May 2022 through in or about April 2024, in the District

of Massachusetts and elsewhere, the defendants,

1)  OSCAR MANUEL CASTANOS GARCIA,
2)  JOEL JOSE CRUZ RODRIGUEZ, a/k/a "Paflow,"
3)  EDWARD JOSE PUELLO GARCIA,
4)  JOAN MANUEL MATHILDA LEON,
5)  LUIS GERMAN SANTOS BURGOS, a/k/a "Mambo Flow,"
6)  RANSEL STARLIN TAVAREZ JIMENEZ, and
7)  JOEL FRANCISCO MATHILDA LEON,

conspired with each other, with CC-1, CC-2, CC-3, CC-4, and CC-5, and with others known and

unknown to the Grand Jury to:

(a) commit mail fraud, that is, having devised and intending to devise a scheme and artifice to

defraud, and for obtaining money and property by means of materially false and fraudulent

pretenses, representations, and promises, to knowingly cause to be delivered by mail and

by any private and commercial interstate carrier according to the direction thereon any such

thing for the purpose of executing the scheme to defraud, in violation of Title 18, United

States Code, Section 1341; and

(b) commit wire fraud, that is, having devised and intending to devise a scheme and artifice to

defraud and to obtain money and property by means of materially false and fraudulent

pretenses, representations and promises, to transmit and cause to be transmitted, by means of wire communications in interstate and foreign commerce, writings, signs, signals, pictures and sounds, for the purpose of executing the scheme to defraud, in violation of Title 18, United States Code, Section 1343.

All in violation of Title 18, United State Code, Section 1349.

## COUNT TWO
## Money Laundering Conspiracy
### (18 U.S.C. § 1956(h))

The Grand Jury further charges:

136.    The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 133 of this Indictment.

137.    From at least as early as May 2022 through in or about April 2024, in the District of Massachusetts and elsewhere, the defendants,

1) OSCAR MANUEL CASTANOS GARCIA,
2) JOEL JOSE CRUZ RODRIGUEZ, a/k/a "Paflow,"
3) EDWARD JOSE PUELLO GARCIA,
4) JOAN MANUEL MATHILDA LEON,
5) LUIS GERMAN SANTOS BURGOS, a/k/a "Mambo Flow,"
6) GERARDO HERIBERTO NUÑEZ NUÑEZ,
7) RANSEL STARLIN TAVAREZ JIMENEZ, and
8) JOEL FRANCISCO MATHILDA LEON,

conspired with each other, with CC-1, CC-2, CC-3, CC-4, CC-5, and CC-6, and with others known and unknown to the Grand Jury to:

(a) conduct and attempt to conduct financial transactions, to wit, delivering, depositing, or receiving cash, knowing that the property involved in such transactions represented the proceeds of some form of unlawful activity, and which in fact involved the proceeds of specified unlawful activity, that is, conspiracy to commit mail fraud and wire fraud, in violation of Title 18, United States Code, Section 1349, and knowing that the transactions were designed, in whole and in part, to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i);

23

(b) transport, transmit, and transfer and attempt to transport, transmit, and transfer funds, to wit, proceeds from grandparent scams, from a place in the United States to or through a place outside the United States knowing that the funds represent the proceeds of some form of unlawful activity and knowing that such transportation, transmission, and transfer was designed, in whole or in part, to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(2)(B)(i); and/or

(c) knowingly engage and attempt to engage in monetary transactions in criminally derived property of a value greater than $10,000, that is, one or more bank deposits of or exceeding $10,000, where such property was derived from specified unlawful activity, that is, conspiracy to commit mail fraud and wire fraud, in violation of Title 18, United States Code, Section 1349, as charged in Count One of this Indictment, in violation of Title 18, United States Code, Section 1957.

All in violation of Title 18, United States Code, Sections 1956(h).

<u>WIRE FRAUD FORFEITURE ALLEGATION</u>
(18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c))

The Grand Jury further alleges:

138.    Upon conviction of the offense in violation Title 18, United States Code, Section 1349, set forth in Count One, each of the defendants,

1)  OSCAR MANUEL CASTANOS GARCIA,
2)  JOEL JOSE CRUZ RODRIGUEZ, a/k/a "Paflow,"
3)  EDWARD JOSE PUELLO GARCIA,
4)  JOAN MANUEL MATHILDA LEON,
5)  LUIS GERMAN SANTOS BURGOS, a/k/a "Mambo Flow,"
6)  RANSEL STARLIN TAVAREZ JIMENEZ, and
7)  JOEL FRANCISCO MATHILDA LEON,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the offense.

139.    If any of the property described in Paragraph 138, above, as being forfeitable pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), as a result of any act or omission of a defendant --

a.  cannot be located upon the exercise of due diligence;

b.  has been transferred or sold to, or deposited with, a third party;

c.  has been placed beyond the jurisdiction of the Court;

d.  has been substantially diminished in value; or

e.  has been commingled with other property which cannot be divided without difficulty;

25

it is the intention of the United States, pursuant to Title 28, United States Code, Section 2461(c),
incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property
of that defendant up to the value of the property described in Paragraph 138 above.

All pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c).

## MONEY LAUNDERING FORFEITURE ALLEGATION
### (18 U.S.C. § 982(a)(1))

The Grand Jury further alleges:

140.    Upon conviction of the offense in violation of Title 18, United States Code, Section 1956(h), set forth in Count Two, each of the defendants,

1) OSCAR MANUEL CASTANOS GARCIA,
2) JOEL JOSE CRUZ RODRIGUEZ, a/k/a "Paflow,"
3) EDWARD JOSE PUELLO GARCIA,
4) JOAN MANUEL MATHILDA LEON,
5) LUIS GERMAN SANTOS BURGOS, a/k/a "Mambo Flow,"
6) GERARDO HERIBERTO NUÑEZ NUÑEZ,
7) RANSEL STARLIN TAVAREZ JIMENEZ, and
8) JOEL FRANCISCO MATHILDA LEON,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(1), any property, real or personal, involved in such offense, and any property traceable to such property.

141.    If any of the property described in Paragraph 140, above, as being forfeitable pursuant to Title 18, United States Code, Section 982(a)(1), as a result of any act or omission of the defendant --

a.    cannot be located upon the exercise of due diligence;

b.    has been transferred or sold to, or deposited with, a third party;

c.    has been placed beyond the jurisdiction of the Court;

d.    has been substantially diminished in value; or

e.    has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 18, United States Code, Section 982(b),

incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property

of that defendant up to the value of the property described in Paragraph 140 above.

All pursuant to Title 18, United States Code, Section 982(a)(1).


A TRUE BILL


CAROLYN BALL
_____
FOREPERSON


_____
DAVID M. HOLCOMB
ASSISTANT UNITED STATES ATTORNEY
DISTRICT OF MASSACHUSETTS


District of Massachusetts: May 14, 2024
Returned into the District Court by the Grand Jurors and filed.


_____  05/14/2024
DEPUTY CLERK

28